Filed 4/21/26  In re T.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re T.D., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, Plaintiff and Respondent, v. T.D., Defendant and Appellant. | E087188 (Super.Ct.No. DLRI2200026) OPINION |

APPEAL from the Superior Court of Riverside County.  Mark E. Petersen, Judge. Affirmed.

Debbie Yen, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Eric A. Swenson and Tyler L. Krentz, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant T.D. (Minor), who was 16 years old at the time, obtained a firearm from a friend and shot an adult male several times resulting in his death. After shooting the victim, he then attacked his uncle with a hammer rendering him unconscious. Prior to this murder and assault, Minor had committed numerous offenses as a juvenile and spent time in juvenile hall and other facilities. The People filed a motion pursuant to Welfare and Institutions Code section 707 seeking to transfer Minor's case to a court of criminal jurisdiction. The juvenile court transferred Minor's case to adult court after finding all factors true under Welfare and Institutions Code section 707 and that he was not amenable to rehabilitation under the jurisdiction of the juvenile court.

On appeal, Minor contends that the juvenile court abused its discretion by finding that Minor should be transferred to a court of criminal jurisdiction as there was not substantial evidence to support two of the five factors under Welfare and Institutions Code section 707. He also insists that the juvenile court abused its discretion by finding he was not amenable to rehabilitation under the jurisdiction of the juvenile court. We find that substantial evidence supports the transfer order.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>PRIOR DETENTIONS</u>

Minor committed several offenses and had several detentions leading up to the current offense which brought about the motion by the People to transfer Minor to a court of criminal jurisdiction. On August 10, 2022, he was booked into the Youth Treatment and Education Center (YTEC) on suspicion of robbery (Pen. Code, § 211). Minor, who was 14 years old at the time, beat up a man waiting for a bus and Minor's cohort stole the

2

man's cellular telephone. Minor was found nearby with blood on his shirt and the man's cellular telephone in his pocket. A petition pursuant to Welfare and Institutions Code section 602 was filed on August 11, 2022 charging Minor with robbery. Minor admitted the allegations in the petition and was placed in his home on wardship probation for three years.

On December 20, 2022, Minor was taken into custody and placed into the YTEC. A petition was filed on December 21, 2022, for taking a vehicle without consent (Veh. Code, § 10851) and driving without a license (Veh. Code, § 12500). Minor had taken his mother's car without her consent, and she had reported to the police that it had been stolen. Minor returned to his mother's residence in the vehicle while the police were taking the report. A notice of hearing (NOH) for violation of the conditions of the wardship probation was filed by the People. Minor admitted to the NOH. The petition was dismissed. Minor was continued on probation along with being ordered to serve five days in juvenile hall.

A review memorandum was submitted by the probation department on February 22, 2023. Minor's school behavior was reported as poor. Minor had to be transferred to another school. On his first day at the new school, he was suspended for five days for using marijuana. On January 27, 2023, he was suspended for three days for intimidating another student and breaking the student's chain. On that same day, he took property by use of force and intimidation from another student and was suspended for five days. A recommendation was made by school officials that he be expelled. Minor had failed to attend the recommended anger management and victim awareness classes which were

part of his probation. On January 31, 2023, Minor tested positive for marijuana. Minor had completed some community service. It was recommended that Minor continue to be on probation and submit to weekly drug tests. The matter was continued for three months for Minor to comply with the terms of his probation.

On April 6, 2023, while Minor was still on probation, he was taken into custody and placed into YTEC. He was charged in a petition filed on April 7, 2023, with carjacking (Pen. Code, § 215) and attempting to evade a police officer (Veh. Code, § 2800.2). Minor, along with two other suspects, approached the victim at a gas station. Minor placed the victim in a chokehold and demanded his car keys. The victim gave up his keys and Minor proceeded to punch the victim in the face four or five times. Minor and the other two suspects got into the victim's vehicle and drove away. Minor, who was driving, led the police on a high-speed chase until he crashed the vehicle. He fled and led the police on a foot pursuit until he was finally apprehended. It was recommended that Minor remain detained and not returned home.

At a hearing held on April 10, 2023, the juvenile court ordered that Minor be detained at juvenile hall as continuance in the mother's home was not appropriate. Probation submitted a pre-plea report. Minor had advised the probation department that he was jumped into the Happy Town Pomona gang when he turned 14 years old. His gang moniker was "Active." Minor was expelled from school in February 2023. Minor's mother claimed he was enrolled in home school. Minor admitted to using marijuana two times each week. Minor was reported to suffer from night terrors and was prescribed medication. Minor had never completed counseling as ordered as part of his probation.

4

Minor had not been submitting to drug testing.  He finally was tested on March 28, 2023, and tested positive for marijuana.  The probation department was concerned about the current charges as they were very serious in nature and showed disregard for the safety of others.  The probation department recommended out-of-home placement.

On June 16, 2023, Minor admitted to the carjacking charge and the evading a police officer charge was dismissed.  Minor was again placed on wardship probation.  Minor was to remain in juvenile hall until an appropriate placement could be found for him.  Upon successful completion of placement, he could be returned to his mother's home.  The maximum confinement was six years.  Minor was seen by a physician who reported that Minor suffered from post-traumatic stress disorder (PTSD) and "Unspecified Disruptive, Impulse Control and Conduct Disorder."  He was prescribed medication.  Minor had been placed at Boys Republic on July 5, 2023.

On October 23, 2023, a NOH was filed by the probation department.  Minor had run away from the court-ordered placement facility of Boys Republic on October 20, 2023.  His whereabouts were unknown.  A warrant for Minor's arrest was executed by the juvenile court on October 24, 2023.

On November 22, 2023, the probation department submitted a review memorandum.  Prior to being AWOL from Boys Republic, Minor had participated in counseling and had been attending high school.  However, he had several behavior reports.  He also continued to test positive for marijuana.  Minor's whereabouts were still unknown.  At the six-month review hearing held on December 4, 2023, Minor had still not been found.  The matter was set for a 12-month review hearing.

5

On January 4, 2024, Minor surrendered himself to the Riverside Police Department on the outstanding warrant. A hearing on the NOH filed on October 23, 2023, was conducted on January 5, 2024. Minor was placed in juvenile hall. The matter was continued to January 8, 2024 At the NOH hearing, Minor admitted to leaving Boys Republic without authorization. Minor was ordered to remain at juvenile hall until a decision was made on disposition.

The probation department prepared a report on the proper disposition. It concluded that placement in a secure youth treatment facility was required based on several factors. The probation department noted that despite multiple efforts to support Minor in his treatment, he had failed to maintain sobriety and continued to engage in negative behavior. The probation department recommended placement away from the area in a facility similar to Boys Republic would be appropriate so he could focus on his treatment. At the hearing on the NOH, the People objected to placement and sought to have him in a secure facility like YTEC. The matter was continued for a contested dispositional hearing.

A NOH was filed on January 31, 2024. It alleged that Minor had violated his wardship probation by committing battery (Pen. Code, § 242) and vandalism (Pen. Code, § 594, subd. (a)(2)) on December 30, 2023. He was alleged to have repeatedly punched a female in the face and smashed her cellular telephone. A hearing was held on February 6, 2024. The probation department was ordered to prepare a new memorandum with disposition recommendations based on all the new information. Minor remained detained at juvenile hall.

6

The probation department filed a memorandum on February 26, 2024, recommending placement at a secure facility, YTEC, for Minor's own safety and the safety of the public. The maximum confinement time would be six years. On February 29, 2024, Minor admitted to the October 23, 2023, NOH and the People agreed to dismiss the new NOH filed on January 31, 2024. Minor was to be placed at YTEC. On February 23, 2024, Minor was approved for continued psychotropic medication. It was reported that Minor had been getting into fights with other inmates at juvenile hall. One of his victims had to be taken to the hospital as he had received a concussion. Minor was placed at YTEC on April 3, 2024. Minor graduated from YTEC on October 9, 2024, and was released from custody.

On October 19, 2024, Minor was detained on charges of two counts of assault with a firearm (Pen. Code, § 245, subd. (a)(2)) on behalf of the Happy Town Pomona gang (Pen. Code, § 186.22). A NOH was filed on January 10, 2025. On October 19, 2024, Minor and three other youths approached their two victims in the park. One of the suspects pistol whipped one of the victims while another told him not to move or he would kill him. The other victim reported that Minor had pointed a pistol at his face. The other two suspects were apprehended and admitted Minor was present during the time of the assaults. In November and December 2024, Minor tested positive for marijuana and alcohol. Minor had not been enrolled in school.

Minor was ordered detained at juvenile hall on January 13, 2025. According to the report submitted by the probation department on January 27, 2025, the probation department was recommending Minor's placement in the Pathways to Success program

7

(Pathways). It was recommended that he be committed for four years in order to complete all of the treatment programs. The probation department also requested that Minor be restrained at all times while he was in the courtroom. He had been involved in two fights while in court holding. The request was granted.

A memorandum on the January 10, 2025, NOH and subsequent petition was filed on February 21, 2025. The probation department stated that the nature of the current offense was "exceptionally severe and violent." Minor coordinated with the other suspects and showed a "disturbing level of indifference and brutality." He was a significant danger to society. Minor was a documented Happy Town gang member. He had "H" and "T" tattoos. The probation department also reviewed Minor's juvenile justice history.

The probation department noted that child protective services had been involved with Minor's family from 2011 through 2024 based on allegations of general neglect by Minor's mother. Minor denied being a victim of physical or sexual abuse as a child; he was unsure if he was subjected to emotional abuse. Minor reported using drugs because he was "feeling bored." Minor noted some childhood trauma but did not identify the trauma. The evaluator from the probation department was concerned the trauma was based on the death of Minor's father and the neglect by his mother. However, his childhood trauma was the not the only contributing factor to his criminal activity. He showed no remorse for his criminal activity. The probation department noted it was particularly disturbing that he committed this crime only 10 days after his release from YTEC.

8

As for the time of confinement necessary for Minors rehabilitation, Minor had been involved in an altercation in the court holding where he punched another youth in the face. On February 9, 2025, he was involved in a "physical altercation" in the shower with another inmate at juvenile hall. He had also been heard talking about his gang. Minor was found suitable for commitment to Pathways. Minor was meeting all of his developmental milestones and had successfully held a job while at YTEC. Minor's mother felt that Minor struggled with anger management and grief due to the passing of his father. The probation department also noted that despite prior interventions including therapy and less restrictive secure treatment programs, he repeatedly disregarded his terms and conditions of probation. His confinement should be for four years.

At the hearing on February 27, 2025, Minor admitted to the violation of Penal Code section 245, subdivision (a)(2), along with the gang enhancement pursuant to Penal Code section 186.22, subdivision (b)(1)(B). He agreed to maximum confinement of eight years at Pathways. The NOH was dismissed by the People. Minor was on the waitlist to be admitted into Pathways for a baseline term of four years.

B.     CURRENT CHARGES

A new petition was filed on April 9, 2025, which charged Minor with murder (Pen. Code, § 187, subd. (a)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) and possession of a firearm by a minor (Pen. Code, § 29820, subd. (a)). It was additionally alleged for the murder charge that Minor personally used a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subd. (d)). It was also alleged as to the assault that Minor caused great bodily injury within the meaning of Penal Code

9

section 12022.7, subdivision (a). According to a detention hearing report filed by the probation department on April 10, 2025, on November 6, 2024, Minor went to a house belonging to his uncle, David Rhodes. Minor was accompanied by his cousin A.D. and her boyfriend, P.V. Minor asked Rhodes if the victim S.S. was at the house. They found the victim in his room next to the garage. Rhodes heard gunshots. He yelled at Minor and the two others who were standing just outside the victim's room that they could not shoot at his house. Rhodes looked inside the victim's room and saw that the victim appeared to be dead. Minor told Rhodes, " 'I fucked up uncle, I shot your friend.' " Minor also told him, " 'I have the devil in me.' " Rhodes believed that Minor was under the influence of methamphetamine. Minor then struck Rhodes in the head several times with a hammer. Rhodes fell unconscious after being struck with the hammer.

Cellular telephone records showed that Minor was at Rhodes's home the night of the suspected murder. Recovered casings matched casings from a shooting that occurred on the Gila River Indian Reservation in Arizona in May 2024. The victim died from multiple gunshot wounds to his torso, back and arms.

P.V. admitted transporting his firearm from Arizona to California. He witnessed Minor use the firearm to shoot the victim. He also witnessed Minor hit Rhodes with the hammer. P.V. believed that Minor and his grandmother hid the hammer and other evidence before the police arrived. A.D. heard Minor shoot the victim. She also overheard Minor apologize to his grandmother for shooting the victim.

C.      MOTION AND RULING ON TRANSFER TO COURT OF CRIMINAL

JURISDICTION

On April 10, 2025, the People filed a notice of motion and motion to transfer to a court of criminal court jurisdiction pursuant to Welfare and Institutions Code section 707, subdivision (a)(1) (Transfer Motion). The Transfer Motion was based on the grounds that Minor was 16 years old or older at the time of the commission of the crime and that he was not amenable to the care, treatment and training available through facilities of the Juvenile Court. At a hearing held on April 11, 2025, counsel for Minor asked for a Welfare and Institutions Code section 707 transfer report (Transfer Report). Minor was to remain detained at juvenile hall.

The probation department filed the Transfer Report on May 5, 2025. At the time of the report, Minor was 17 years old. The report detailed that Minor had shot and killed the victim on November 6, 2024, on the Soboba Indian Reservation. He also attacked Robles with a hammer. Minor was interviewed on November 6, 2024, by the police. He admitted that he was at Rhodes's house and that Rhodes told Minor that he was under the influence of a controlled substance. Rhodes told Minor that he had been in a fight with the victim. Rhodes was bleeding from his head and face. Minor went to the victim's room and found him deceased. Rhodes told Minor that the victim had attacked him with a hammer and that the victim was stealing from him. Minor then left the residence and went home. Minor admitted picking up the hammer he saw in the living room at Rhodes's house but then dropped it. After an investigation, the police determined that Minor had shot the victim and he was arrested on April 9, 2025. Statements regarding

11

the impact of the death of the victim were received from the victim's family members and friends. The loss of the victim had hit the family and friends hard, and they desired to have Minor tried as an adult.

Minor had "H" and "T" tattoos on his arms. He was of American Indian ethnicity. Minor was now denying any gang involvement, and claimed his tattoos stood for "Hot Topic." Minor also stated he left the gang in October 2024. Minor was in the 10th grade and attending school while at juvenile hall. He wanted to graduate so he could enter the Army. He denied he needed any special assistance at school. He was not taking any medication. He admitted to drinking alcohol and using marijuana; he denied any use of methamphetamine. Minor decided not to continue psychiatric treatment at juvenile hall but he was participating in some individual and group therapy. Minor was previously diagnosed with PTSD and "Unspecified Disruptive, Impulse Control and Conduct Disorder." Minor denied he was experiencing any mental health issues; he was not taking medication. He also denied any abuse as a child.

It was reported by the supervising probation officer at juvenile hall that Minor, since his admission in January 2025, had demonstrated inconsistent behavior and was unpredictable. He had angry outbursts, which required his separation from other inmates. In March 2025, Minor sustained a rule violation for inappropriate sexual misconduct. It was reported from another inmate that Minor had made harassing statements to him that were sexual in nature and had committed unwanted touching. An investigation was ongoing. Another inmate recently complained about inappropriate statements made by Minor ,which required that Minor be separated from other inmates. Minor had no

explanation for why he ran away from Boys Republic. The Transfer Report also provided a detail of his previous charges.

Minor was interviewed on April 15, 2025, at juvenile hall. He was not asked about the current offense based on the court's order not to inquire about the offense. He was willing to comply with any terms of probation. He wanted to be homeschooled. He wanted to be placed at Pathways. He wanted to graduate and become a barber.

Minor's mother was interviewed and she was an "emotional wreck." She opined the reasons for Minor's behavior may be due to his father being incarcerated since Minor was three years old. Minor and his father had a "bad falling out" right before his father passed away in 2023. Minor's mother hoped the allegations were not true and was not sure of the appropriate disposition should they be found true.

The Transfer Report then detailed the five factors in Welfare and Institutions Code section 707. As for the degree of criminal sophistication exhibited, Minor showed sophistication by illegally obtaining a firearm especially at his young age. The reporter also noted that he was unable to discuss the crime with Minor due to the court order. Further, since no psychiatric evaluation was completed, it was unknown how to evaluate any childhood trauma. Although Minor had previously been treated with medication, he was currently refusing medication. Despite any previous treatment and time at YTEC, Minor continued to engage in violent and very dangerous behaviors. Due to his continued pattern of criminality and the escalation of his level of crime, Minor was deemed appropriate for transfer to a court of criminal jurisdiction.

The second factor, whether he could be rehabilitated prior to the expiration of the juvenile court's jurisdiction, also favored that he should be transferred to adult court. If Minor were to remain in juvenile court jurisdiction, the maximum time he would receive would be seven years. The probation department was concerned that despite all of the prior incarcerations and treatment he continued to commit crimes and procure weapons. They noted, "The [Minor]'s actions, which included a weapon in each of the instant offenses, and further planning to dispose of a murder weapon by providing it to a family member, demonstrate sophistication and a calculated individual who has little regard for the value of life or safety of others." The probation department noted that Minor had "received the entirety of services the juvenile justice system has to offer" but had not benefitted from the services. The probation department addressed the third factor, his previous delinquent history, which dated back to 2022. The probation department detailed his prior offenses which have been set forth, *ante*. Minor's dangerous behavior showed a pattern of engaging in violent offenses and the crimes were escalating. The fourth factor, previous attempts to rehabilitate Minor, detailed his previous commitments to Boys Republic and YTEC, and that he had not benefitted from the programs.

Finally, the probation department addressed the fifth factor, the circumstances and gravity of the offense alleged to have been committed by Minor. It noted the circumstances of the new offense were intentional, violent, reckless and deliberate. They involved sophistication and cruelty toward the victims. He also tried to cover up the crime. There was no indication that Minor's mental and emotional development impeded his ability to know the illegal nature of his actions. His actions showed a high degree of

14

sophistication by illegally acquiring the firearm and disposing of evidence. The probation department concluded that Minor was deemed appropriate for a transfer to a court of criminal jurisdiction.

The first hearing on the Transfer Motion was held on May 8, 2025. The matter was continued based on Minor's counsel wanting a psychological evaluation of Minor. Subsequent reports submitted by the probation department reported that Minor was involved in physical altercations at juvenile hall on May 30 and May 31, 2025. They were gang related. The probation department reported on June 16, 2025, that Minor was upset he had not been transferred to the Pathways. He was refusing to attend school. Minor appeared to have given up.

On July 10, 2025, Minor was transferred to Pathways. Minor reported being happy he was starting the program. On August 20, 2025, it was reported Minor was participating in weekly individual therapy sessions at Pathways. He was attending school. He was respectful to other participants in the program and to staff. Minor was not prescribed medication and did not have any special needs. A contested hearing on the Transfer Motion was set for September 15, 2025.

On September 8, 2025, Minor's counsel filed opposition to the Transfer Motion relying on an evaluation by Dr. Tonneka Caddell, a clinical psychologist, to support that Minor should remain in juvenile court. Dr. Caddell concluded that Minor lacked antisocial or delinquent tendencies, and based on his personality testing and background, he was amenable to rehabilitation and should remain in juvenile court.

15

Dr. Caddell interviewed Minor and advised him the responses may be shared with the juvenile court and opposing counsel. Dr. Caddell issued a scale of intelligence test, a PTSD checklist, a depression test and assessment of violence risk test. Dr. Caddell reviewed all of Minor's records after November 2024.

As for Minor's background, he indicated that both of his parents were Native American. He lived on the Soboba Reservation during his childhood. He spent time in foster care, which he described as bringing stability to his life. Minor reported that he moved many times while he was young as his mother had no income. She relied on money from the tribe. He expressed frustration with their financial situation. He felt as though he had to raise himself. He indicated that his mother remarried and his stepfather was emotionally abusive toward him.

As for his father, Minor reported feeling abandoned by his father. He had early exposure to guns and drugs. His father went to prison for murder and was killed in prison when Minor was 14 years old. He felt that he was left without a role model when his father went to prison. He also stated that his cousins physically abused him starting when he was seven years old. His only support system was his girlfriend and one friend, Danny, who was a gang member. Danny was involved in illegal activity including theft. Minor moved in with Danny until he was 15 years old. He joined the Happy Town gang at age 14 in order to have a sense of identity and belonging. He had a hard time being consistent at school based on constantly moving. When he was at school, he acknowledged significant behavioral issues.

16

Minor admitted to marijuana use and taking Xanax. He blamed the substance abuse on early exposure to drugs by his family. He insisted that he was under the influence of drugs when he committed most of his crimes. He also blamed impulsiveness and boredom for the reasons he committed his crimes. Minor left his placement at Boys Republic because he thought he was going to be transferred back to juvenile hall because he was fighting a lot. As for his mental health, he reported a history of depression and anxiety. He also reported a history of anger issues and PTSD. He did not take medication because he did not like how it made him feel. He coped with the anxiety and depression by praying to Santa Muerte which Dr. Caddel explained was common for those engaged in illegal activities. Minor appeared to be somewhat guarded but was oriented to person, place, time and situation. He had no thought disturbances such as hallucinations or paranoia.

As for the tests administered to Minor, on the scale of intelligence, he scored in the borderline range of intellectual functioning. Dr. Caddell did note that Minor was discouraged during the test and appeared to give up. It was possible that the test may have underestimated his intellectual ability. The test on depression showed that he was suffering from "severe depression." He also scored on the PTSD test to likely be suffering from PTSD. Dr. Caddell administered the "Structured Assessment of Violence Risk in Youth" (SAVRY) test. It focused on the future risk of violent or harmful offending by youths ages 12 through 18. There were 24 factors that were considered that were divided into three categories: historical risk factors; social/contextual risk factors; and individual/clinical risk factors. Minor had four factors that were high in the historical

17

risk factors, which addressed past experiences and behaviors. He was moderate in three of the factors. The factors that were critical to his risk were the lack of personal support, poor parental management, and stress/poor coping. The lack of supportive relationships was critical to a future risk for violence. Minor significantly lacked parental involvement. He had three factors in the individual/clinical risk factors that were high including negative attitudes, risk-taking behavior and anger management problems. Dr. Caddell stated, "Risk-taking behaviors, negative attitudes, and anger management difficulties were the most salient of his individual risk factors and should be addressed with relevant interventions."

Dr. Caddell reviewed the five factors in Welfare and Institutions Code section 707. She referred to research on developmental maturity and that they showed the process of childhood to adulthood was not complete until the age of 25. Minor's drug use and desire for connection made him more susceptible to negative peer influence and engagement in reckless behaviors. He never learned adequate coping skills. He also had borderline intellectual ability. These all moderated the idea that Minor's behaviors involved a high degree of criminal sophistication. Dr. Caddell also believed that Minor could be rehabilitated with proper interventions, supervision, guidance and programs in place within the juvenile court's jurisdiction. She referred to his current behavior at juvenile hall showing he was capable of complying with supervision requirements. Dr. Caddell insisted that Minor had experienced a number of traumatic and distressing experiences that had not been adequately addressed. Those issues could be addressed under the jurisdiction of the juvenile court and not in criminal court. He should be

18

treated for PTSD and persistent depressive disorder. His substance abuse all should be addressed. He required extensive treatment. He was capable of making positive changes if he was in a safe environment that was highly structured and supervised. She opined that treatment could address his criminal background. She also believed that Minor had not performed adequately during prior programs because he did not understand the importance of participating in treatment. She believed he could complete his treatment if provided with social support, guidance and disengagement from negative associations. It was her belief that Minor would not receive the rehabilitative care he needed if transferred to criminal court.

In summary, she noted that Minor had not received appropriate support. Although he was provided with some support once he was involved with the juvenile court system, he was not "mentally or emotionally" able to benefit from the support. She also noted that in the Native American community, there was a strong correlation between delinquency and drug use. Minor needed extensive support to develop resiliency, coping skills and necessary protective factors to become a productive member of society. He was amenable to such rehabilitation. He was suitable for juvenile court proceedings.

Minor's counsel argued that, based on these findings, Minor's current crime lacked criminal sophistication based on his age and negative peer influence. Minor could rehabilitate for the six years in juvenile custody. Further, based on his age, he did not grasp the consequences of committing the current offense.

19

The People filed a response. They agreed with the overall recommendation of the probation department to transfer Minor to a court of criminal jurisdiction. The People referred to the assessment by the probation department under the five factors of Welfare and Institutions Code section 707. The People argued the weight that the court gives to each factor was within the trial court's discretion. The court had to find by clear and convincing evidence that Minor was not amenable to rehabilitation while under the jurisdiction of the juvenile court. The People also argued the trial court should consider the safety and protection of the public.

The hearing was conducted on September 15, 2025. The juvenile court stated that it had reviewed the report filed on May 5, 2025, the opposition filed by Minor, along with the evaluation by Dr. Caddell, and the brief filed by the People on September 9, 2025. The People reiterated their argument that all five factors in Welfare and Institutions Code section 707 supported transfer. There was clear and convincing evidence supporting the transfer. Minor's counsel argued that Minor had been abandoned by his father, mother and had no role models. He should be given the opportunity to rehabilitate. No evidence was presented and the matter was taken under submission.

The juvenile court filed its "Ruling on Submitted Matter on September 15, 2025" on October 2, 2025. The juvenile court reviewed the factual background of the case. The juvenile court confirmed it had read Dr. Caddell's report and provided a summary of that report. The juvenile court noted, "Interestingly, Dr. Caddell's report does not provide any insight as to the minor's participation in a multitude of crimes, his planning and execution of those crimes, and his ability to obtain weapons, such as firearms in an illegal

20

manner." The juvenile court also noted that Minor had been afforded treatment at Boys Republic and YTEC. Despite receiving services in these controlled environments, Minor continued to commit crimes upon his release. The juvenile court noted, "Little analysis is given to the minor's actual behavior during his long and complex criminal activity and behavior, as well as multiple attempts at prior rehabilitation." Further, there was no explanation as to why prior services did not help but future services would help.

In evaluating the five factors, the juvenile court found that Minor exhibited a high degree of sophistication. Minor graduated from the YTEC program on October 9, 2024, and illegally obtained a firearm on October 19, 2024. Prior to the current crimes, he participated in the Boys Republic program and YTEC. Minor had violently victimized five separate individuals since the age of 14. The juvenile court concluded that by obtaining an illegal firearm, planning to go to the victim's residence, and attacking two victims, he showed he had the ability to plan and engage in violent criminal conduct. Further, by discarding or hiding the firearm, he showed the mindset of trying to avoid responsibility. The burden of proof was met with this criteria.

As for whether Minor could be rehabilitated prior to the expiration of juvenile court jurisdiction, Minor was currently 17 years old and jurisdiction would expire when he was 23 or 25 years old. Despite the YTEC program and other services, Minor's criminal behavior continued. He continued to "procure weapons." His procurement and disposal of the weapons showed sophistication and disregard for the safety of others. His pattern of criminal behavior while on probation showed he was not willing to comply with terms of probation. After being released from YTEC, he committed new offenses

21

within 30 days. Minor had been afforded all levels of services by the probation department. His criminal mentality had continued, and he was currently refusing medication. The juvenile court concluded Minor did not show "amenability to rehabilitation at all." Minor showed no respect for the law or court orders. Sufficient time did not exist to provide Minor with successful rehabilitative services.

The juvenile court also found the third factor was supported by substantial evidence as Minor had an extensive, documented, delinquent history. Previous attempts to rehabilitate Minor had not been successful despite the previous services being adequate and extensive. Minor had completed the YTEC program. The juvenile court stated that any progress seen in the programs was merely a "facade and did not represent a true intent to change behavior or comply with lawful orders." Finally, the gravity of the offenses supported transfer to a court of criminal jurisdiction. Minor attacked his victims in a violent and vicious manner. Minor confessed to killing the victim. He hid evidence including his bloody shoes and the handgun.

The juvenile court concluded, after considering all the evidence, that "the People have met their burden by clear and convincing evidence to have this court order a transfer to a court of criminal jurisdiction."

At a hearing on October 2, 2025, the parties appeared in court on the written ruling. The juvenile court put on the record that it had reviewed all of the documents submitted by the parties and reviewed the criteria in Welfare and Institutions Code section 707. It found Minor was 16 years old when he committed the current crimes. It found by clear and convincing evidence that Minor should be transferred to a court of

22

criminal jurisdiction.  The juvenile court stated on the record the evidence in support of the five factors as found in the written ruling.  The order of transfer was filed on October 2, 2025.

## DISCUSSION

Minor contends that two of the factors found true by the juvenile court—the degree of criminal sophistication and whether he could be rehabilitated prior to the expiration of juvenile court jurisdiction—do not support his transfer to juvenile court under Welfare and Institutions Code section 707.

"In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (Welf. & Inst. Code, § 707, subd. (a)(3).)  "[T]he express terms of [Welfare and Institutions Code] section 707[, subdivision](a)(3) require the court to evaluate five criteria in determining whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' and that the statute does not require that any of those criteria be afforded any greater weight than any other."  (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 167 (*Miguel R.*).)

These five factors include:  "(1) '[t]he degree of criminal sophistication exhibited by the minor' (§ 707, subd. (a)(3)(A)(i)); (2) '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction' (*id.*, subd. (a)(3)(B)(i)); (3) '[t]he minor's previous delinquent history' (*id.*, subd. (a)(3)(C)(i)); (4) '[s]uccess of previous attempts by the juvenile court to rehabilitate the minor' (*id.*, subd. (a)(3)(D)(i));

23

and (5) '[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor' (*id.*, subd. (a)(3)(E)(i))." (*In re J.S.* (2024) 105 Cal.App.5th 205, 212 (*J.S.*).)

"The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. [Citation.] In conducting substantial evidence review, we draw all reasonable inferences in support of the court's findings." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) "We review the juvenile court's determination to transfer a minor to criminal court for abuse of discretion." (*J.S.*, *supra*, 105 Cal.App.5th at p. 211.)

Minor disputes two of the relevant factors: the degree of Minor's criminal sophistication, and whether he could be rehabilitated prior to the expiration of the juvenile court's jurisdiction.

A.      CRIMINAL SOPHISTICATION

Minor first disputes that the evidence supported that he exhibited criminal sophistication. "When evaluating the degree of criminal sophistication exhibited by the minor, [Welfare and Institutions Code] section 707 requires the juvenile court to 'give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status

24

of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication.' " (*J.S.*, *supra*, 105 Cal.App.5th at pp. 213-214.)

The juvenile court concluded that the factor of criminal sophistication was supported by the evidence. It relied on the fact that 10 days after Minor was released from YTEC, he obtained a firearm. This showed his criminal sophistication and ability to engage in negative behavior. The juvenile court also referred to Minor having been involved in three prior arrests that involved firearms. He also had been involved in various programs including counseling and anger management programs in his prior commitments. It noted that Minor had committed violent crimes against five different victims since the age of 14. It concluded that by obtaining an illegal firearm, planning to go to the victim's residence, killing the victim, and then hitting Rhodes with a hammer, showed Minor was capable of planning and engaging in violent conduct. Further, hiding the evidence showed a criminal mindset. The juvenile court properly concluded based on Minor committing several prior violent crimes, and the planned murder here wherein he illegally obtained a firearm, that his criminal sophistication supported transfer to a court of criminal jurisdiction.

Minor complains that the juvenile court did not meaningfully consider Dr. Caddell's findings. The juvenile court first noted in its ruling that it had reviewed Dr. Caddell's report. This included the information about Minor's borderline intellectual ability, his depression over his father dying in prison, his upbringing that included involvement of child protective services, and that Minor's drug use contributed to the crimes he committed. Dr. Caddell found that there was not a high degree of

25

sophistication based on the fact Minor's brain was not fully developed. Further, his drug use and need for connection with someone made him susceptible to peer influences and risky behavior. The juvenile court did consider the report by Dr. Caddell. It provided a detailed summary of the evidence in Dr. Caddell's report in its written ruling. The juvenile court in its ruling stated, "The court has taken into consideration the psychological evaluation when evaluating each of the criteria listed below." It also noted in its ruling that Minor had been involved with child protective services due to abuse and neglect. It further noted Dr. Caddell's conclusion that Minor was amenable to treatment in the juvenile court. Minor's claim on appeal that the juvenile court did not consider the findings as to his childhood trauma is belied by the record. Further, the juvenile court remarked that Dr. Caddell's report failed to consider that Minor's prior participation in services at Boys Republic, YTEC, and services did nothing to stop his continued criminal activity. It was clear that the juvenile court reviewed the entirety of Dr. Caddell's report but found, as was within its discretion, that it was not persuasive based on Minor's crimes and his failure to benefit from services already provided.

Minor also contends the juvenile court erred by concluding that the killing of the victim was calculated and planned. He relies on evidence that P.V. disclosed that Minor may have been sexually abused by the victim. The killing could have been in the heat of passion. Further, Minor could have been armed with a firearm for any reason, including that he was going to fix it up or because he was a gang member. Minor also points to his youth, which undermines a finding of criminal sophistication.

26

The evidence supports the juvenile court's conclusion that Minor planned the killing of the victim. Minor obtained a firearm 10 days after leaving YTEC. While there was no evidence that he specifically obtained the firearm to kill the victim, it is undisputed that he took a loaded firearm to his uncle's home. He went to his uncle's house armed with said firearm and asked immediately for the victim. He then shot the victim multiple times. The evidence supports a calculated killing. P.V. told the probation officer that he believed that Minor wanted to "get" the victim. When they arrived at Rhodes's house, Minor said that he was going to "handle this." Immediately following the murder, Minor told his uncle he had "fucked up" and killed the victim, and that he had the "devil in me." Further, he actively sought to hide the firearm after the killing and he tried to blame his uncle. While Minor claims that the murder could have been the result of Minor being sexually assaulted by the victim, Minor denied to the probation officer that he had ever been physically or sexually abused. The juvenile court could reasonably rely on Minor's statement. All of these factors support that Minor calculated the killing of the victim by immediately asking for the victim when he arrived at Rhodes's home, readily admitting to killing the victim, and disposing of the firearm to avoid detection.

Finally, the juvenile court did consider Minor's age in considering his criminal sophistication. The court relied on the evidence pointed out by the People that Minor had committed violent crimes against five different victims while he was between the ages of 14 and 17. Further, Minor had the "mindset" of destroying or getting rid of the evidence, which showed maturity. The juvenile court also noted that Minor was 16 years and 8

27

months when he committed the instant crime and had received numerous services prior to the commission of the crime. Finally, as noted, the juvenile court had extensively reviewed Dr. Caddell's report. The juvenile court's finding as to the first criteria of criminal sophistication is supported by substantial evidence.

B.     REHABILITATION WITHIN JUVENILE COURT JURISDICTION

Minor also contends there was no substantial evidence supporting that he could not be rehabilitated prior to the expiration of juvenile court jurisdiction.

"[T]he focus of the second criterion [in Welfare and Institution Code section 707] is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Miguel R.*, *supra*, 100 Cal.App.5th at pp. 166-167.) When evaluating this criterion, "the juvenile court shall give weight to . . . the minor's potential to grow and mature." (Welf. & Inst. Code, § 707, subd. (a)(3)(B)(ii).)

The juvenile court noted that Minor would have approximately five or seven years to benefit from rehabilitative services. The juvenile court agreed with the probation report that Minor's pattern of criminal behavior while on probation showed he was not willing to comply with the terms of probation. Minor had left Boys Republic, and he completed the YTEC program, only to immediately obtain a gun and commit murder. He had received therapy, anger management classes and participated in substance abuse programs. He refused his medication. The juvenile court concluded that he did not "show amenability to rehabilitation at all. In fact, the minor has gone out of his way to continue with delinquent behavior" and escalated the severity by shooting and killing

28

another human being. The juvenile court noted that Minor had no respect "for the law or court orders."

These conclusions were supported by substantial evidence. Minor was placed on probation in 2022 after committing a robbery during which he beat the victim. While on probation, he drove his mother's car without her permission and had to serve five days in juvenile hall. Not more than four months later, he was involved in a carjacking, wherein even though the victim immediately gave up his keys, he punched the victim in the face. He was sent to Boys Republic in July 2023, where he went to school and engaged in services, but ran away in October 2023. He ran away because he thought he was going to be transferred to juvenile hall for fighting. In January 2024, he surrendered but was found to have committed battery and vandalism while AWOL from Boys Republic. While in juvenile hall, he was involved in fights.

Minor was committed to YTEC in April 2024, and graduated October 9, 2024. Once released, he committed assault with a deadly weapon against two victims. He was placed in juvenile hall awaiting transfer to Pathways. In March 2025, he had to be restrained at all times because he punched other inmates in the holding cell at court. Also in March 2025, he was being investigated for inappropriate sexual behavior with another inmate at juvenile hall. He had to be separated from the other inmates. Further, in May 2025, he had two physical altercations in juvenile hall.

Despite commitment to juvenile hall, and other commitments, Minor was incapable of following orders. He continued his criminal activities, and as stated by the juvenile court, he showed no respect to the law or court orders. The juvenile court properly found that there was not sufficient time to provide Minor with successful rehabilitative services. Although there is evidence of Minor's childhood trauma and that he suffered from PTSD and depressive disorder, he was given multiple opportunities to address these issues. The structured program at YTEC did not benefit Minor. He continued to get into fights. The juvenile court was well within its discretion to find that Minor would not benefit from services during the time he was subject to the juvenile court's jurisdiction.

Finally, Minor argues that although the trial court found that all five criteria in Welfare and Institutions Code section 707 weighed in favor of transfer, substantial evidence fails to support that he was not amenable to rehabilitation. We disagree. The juvenile court reviewed all of the evidence, including the information related to Minor's childhood, and found all five factors in Welfare and Institutions Code section 707 favored transfer to a court of criminal jurisdiction. The juvenile court did not abuse its discretion in making a finding that Minor was not amenable to rehabilitation. We affirm the juvenile court's order.

# DISPOSITION

The juvenile court's order transferring Minor to a court of criminal jurisdiction is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____
                                      Acting P. J.


We concur:


CODRINGTON _____
                                      J.


RAPHAEL _____
                                      J.

31